Felipe Neri Jorge y su esposa Francisca Gutiérrez de Jorge, demandantes y apelados, *v.* Carmen Umpierre, asistida de su esposo Salvador Quiñones, demandados y apelantes.

No. 6488.—*Sometido:* Febrero 20, 1935. *Resuelto:* Noviembre 22, 1935.

*R. Castro Fernández*. abogado de los apelantes; *R. Cuevas Zequeira*
y *P. Amado Rivera,* abogados de los apelados.

El Juez Asociado Señor Hutchison, emitió la opinión del
tribunal.

William Jorge, niño de 16 años de edad, mientras corría
en el estribo de un automóvil Chevrolet de cinco pasajeros,
fué estropeado y muerto por un Cadillac de turismo. El ac-
cidente ocurrió en una extensa recta de la carretera entre
Santurce y una playa conocida por Isla Verde. El Chevro-
let se dirigía a Isla Verde con nueve pasajeros. El Cadillac
regresaba de allí. El dueño del Chevrolet iba dentro del
automóvil, y Jorge, si no era un invitado, iba allí por lo menos
con anuencia suya. Por espacio de una semana había acom-
pañado al dueño del automóvil y a su familia en sus excur-
siones diarias al balneario. Hubo testimonio tendente a de-
mostrar que el Cadillac, momentos antes del accidente, corría
como a 40 millas por hora, y que tenía la vía franca; que al

pasar a dos peatones que caminaban por la derecha de la carretera, el Cadillac se desvió hacia su izquierda, sin reducir la velocidad, y que el Chevrolet venía en dirección opuesta a 10 ó 15 millas por hora, bastante a la derecha del centro de la carretera, cuando el niño fué golpeado por el guardalodo delantero izquierdo del Cadillac.

▄▄ Los señalamientos primero y segundo son al efecto de que la corte inferior cometió error al decidir que el conductor del Cadillac había sido negligente y al concluir que Jorge no había sido culpable de negligencia contribuyente.

Del "Restatement of the Law of Torts" tal como fué adoptado y promulgado por el "American Law Institute", tomamos las siguientes definiciones de los artículos 282, comentario (*f*), y 463, comentario (*b*):

"En tanto en cuanto el riesgo sea de importancia, en la determinación de la existencia de negligencia, este riesgo se define como una probabilidad de daño a otras personas que el actor debe reconocer al tiempo de su acción o inacción."

"Negligencia es aquella conducta que establece un riesgo indebido de daño a otras personas. Negligencia contribuyente es aquélla que envuelve un riesgo indebido de daño a la persona que lo sufre."

El profesor Green, en su tratado "Rationale of Proximate Cause", en las páginas 72–76, dice:

"Habiendo determinado el juez que el interés que se ha lesionado cae dentro de la protección de la regla y que existe evidencia que requiere que el caso se someta al jurado, deberá, bajo la práctica ortodoxa del derecho común, dar al jurado substancialmente la definición de 'negligencia', instruyéndoles en una u otra forma que si el demandado, actuando como una persona razonablemente prudente debió haber previsto que su conducta tendría por resultado daño probable a los intereses envueltos, entonces el demandado había sido negligente. Esta fórmula sobre 'probabilidad de daño', en las distintas formas en que actualmente se le conoce, constituye la forma universal para determinar qué constituye conducta negligente, excepto en aquellos casos en que se ha establecido una norma definitiva, ya sea por estatuto o por decisión de las cortes. De esta manera, la corte trata de transmitir al jurado una norma bajo la

cual se pueda determinar la conducta que se investiga. La previsión de la persona ordinariamente prudente, tal como aparece ante el jurado después que la transacción ha sido terminada, se utiliza de esta manera para determinar si ha habido negligencia. A pesar de que las cortes a través del uso de esta fórmula indican al jurado una norma general de conducta para determinar la naturaleza de la conducta del demandado, tal norma es metafísica. Carece de certeza, y en realidad constituye una ficción. Mientras se solicita del jurado que determine si la conducta del demandado llega al nivel de la del hombre de ordinaria prudencia, éste tiene primero que determinar cuál es la norma envuelta. La corte somete este problema en la mejor forma posible. Carece de medios para fijar la norma a no ser en los términos más generales. El jurado tiene que dar vida a la norma. Por tanto, el jurado se ve obligado a determinar, hasta cierto punto, qué decisión concuerda mejor con los intereses sociales en todo caso de negligencia que se le someta. En estos casos es necesario considerar los intereses envueltos: tanto los de las partes como los de la sociedad; de igual modo que el juez debe desempeñar su primera obligación, según ya se ha indicado. El jurado determina lo que constituye una norma justa bajo todas las circunstancias. Establecerá una norma estricta o flexible. Ese es su deber. Establecerá una norma alta o baja, según su sentido común, su experiencia. inteligencia y criterio. . . De esta manera se determina tanto la norma como el cumplimiento de ella por las partes después que la conducta ha tenido lugar. No teniendo una base fija para medir la conducta de las partes, el jurado debe, a lo sumo, colocarse en la situación que ocupaban las partes con anterioridad a la transacción envuelta; considerar lo que cada una de ellas sabía o debía saber; considerar qué intereses de cada una de las partes serían probablemente lesionados por su conducta individual y en conexión con la conducta de otros, o las cosas que podían razonablemente esperarse; y considerando todos los intereses que probablemente estarían envueltos, incluyendo los del demandante, los del demandado y los de la sociedad en general, y considerando lo que ya ha sido hecho por las partes y lo que ha resultado realmente de la acción combinada y reacción de las partes y de los factores externos, determinar si la conducta de la parte a que se atribuye el daño era razonable, esto es, si está en armonía con la norma por ellos establecida de acuerdo con las instrucciones dadas por la corte. Esto es, a lo sumo, una pobre reseña de lo que el jurado debe considerar en sus deliberaciones sobre la cuestión. Así pues, es al considerar este problema que el jurado ejercita su más importante deber y tiene

ante sí su más amplia discreción. Este es el momento en que el jurado debe determinar si el demandado debe responder de las pérdidas sufridas, asumiendo que ellas fueron causadas por su conducta, o si es preferible que el demandante sufra sus propias pérdidas. Los requisitos necesarios para establecer este elemento de culpa en un caso de negligencia, son lo suficientemente comprensibles para permitir amplia consideración de todos los factores que entran en la determinación de la razonabilidad de la conducta envuelta.

"Ya se ha dicho que la función del jurado al determinar la existencia de negligencia y el método que se sigue para llevar a cabo tal determinación no son completamente distintas a la función del juez y del método que este último sigue para determinar si la regla que se ha invocado es adecuada para la protección de los intereses envueltos. Mas son enteramente distintas. Al resolver su problema principal, el juez puede, y debe, considerar todos aquellos factores que son considerados por el jurado para llegar a sus conclusiones. Pero el juez puede considerar, y generalmente considera, muchos otros factores. La función del juez equivale enteramente a una incursión en el campo de la política pública a seguir; el proceso es el mismo que se requiere para determinar si debe existir o no alguna regla legal. En cambio, la función primordial del jurado es la de hacer apreciaciones de hecho. Y esto sería todo, a no ser por el hecho de que le es imposible a la corte suministrar una norma definitiva para medir la conducta envuelta en el litigio. En otras clases de casos la corte tiene bastante éxito en sentar una norma definitiva; en los casos de negligencia lo más que puede hacer el juez es el establecer una fórmula abstracta que requiere que el jurado siente por sí mismo una norma antes de que pueda cumplir con su deber de apreciar los hechos. Es al establecer esta norma que el jurado ejercita incidentalmente, pero de manera real, la función de crear principios legales. A pesar de que esta norma sirve tan sólo para el caso específico en disputa y de que no puede convertirse en precedente para casos posteriores, sin embargo, en caso futuro el jurado debe también establecer una norma y este proceso debe continuar hasta que se llegue a una norma definitiva de conducta. Cuando esto se ha hecho en cualquier clase específica de casos, el juez luego le suministrará al jurado la referida norma y la única función del jurado será la de determinar si la conducta del demandado cae dentro de ella. En cierto sentido la ley aplicable se establece en cada caso después que la transacción ha sido realizada. Esto equivale a una especie de sistema *ex post facto*."

Según se indica en el comentario (*a*) del artículo 289 del "Restatement":

"Las reglas que determinan la negligencia contribuyente de un demandante son las mismas que determinan la negligencia de un demandado, con la excepción enumerada en el artículo 463, comentario (*a*)."

Podría admitirse que si Jorge fué negligente, su negligencia fué un factor substancial en el resultado, y que al igual que la negligencia de la demandada, fué causa próxima del accidente. Véase, sin embargo: *Godreau* v. *American Railroad Co.,* 17 D.P.R. 791; *Almodóvar* v. *Acosta,* 43 D.P.R. 200; *Robinson* v. *American Ice Co.,* 141 Atl. 244; *Wilkerson* v. *Sanderson,* infra; *Stout* v. *Lewis et al.,* infra; *Rignell* v. *Font,* (Cal.) infra; *Moreno* v. *Los Angeles Transfer Co.* (Cal.) infra; *Ivancich* v. *Davies,* 186 Cal. 520 y *Dania Lumber & Supply Co.* v. *Senter,* infra.

Los artículos 12 (*a*), 12 (*d*), en parte, y 13 (*a*) de la "Ley para Reglamentar el Uso de Vehículos de Motor en Puerto Rico, y para otros fines" (Leyes de 1916, pág. 144), leen como sigue:

"Artículo 12.—(*a*) Las personas que manejen vehículos de motor en los caminos públicos, deberán, en todo tiempo, ejercer el debido cuidado y tomar precauciones razonables para garantizar la seguridad de vidas y propiedades."

"(*d*) Los vehículos de motor que transiten por caminos públicos deberán marchar lo más a la derecha que fuere posible, y esta precaución deberá observarse particularmente cuando se esté doblando una curva. En ese caso, deberá siempre darse aviso con la bocina o aparato de alarma. Cuando un vehículo de motor encontrare peatones, jinetes u otros vehículos siempre pasará por su derecha."

"Artículo 13.—(*a*) La velocidad de un vehículo de motor deberá en todo tiempo regularse con el debido cuidado, tomando en cuenta el ancho, tráfico y uso del camino; y el hecho de conducir, en cualquier tiempo, un vehículo de motor por un camino público a una velocidad que exceda de 48 kilómetros por hora, o dentro de la zona urbana de un municipio a una velocidad mayor de 24 kilómetros por hora, constituirá evidencia *prima facie* de que el vehículo era conducido sin el debido cuidado."

Según la sección 18, la infracción de cualquiera de las disposiciones de dicha ley constituye un delito menos grave.

La corte de distrito no cometió error al decidir que la demandada había sido culpable de negligencia.

■■■ El correr en el estribo de un automóvil puede o no constituir negligencia, según las circunstancias de cada caso.

No existía ley ni ordenanza alguna que prohibiera el correr en el estribo de un vehículo de motor. Por ende, pueden desecharse los casos que envuelven la infracción de una ley u ordenanza de tal naturaleza. Un extracto de la opinión emitida en uno solo de los casos de la índole últimamente mencionada, será suficiente para distinguir algunos de ellos del caso de autos. En *Lorry* v. *Englander Drayage Co.,* 291 Pac. 467, la corte dijo:

"No existiendo ordenanza alguna, la cuestión de si los apelantes fueron negligentes al ir en el estribo dependería de si una persona de ordinaria prudencia hubiese ido en esa posición bajo las circunstancias existentes, y ésta sería una cuestión propia para el jurado. Ivancich v. Davies, 186 Cal. 520, 199 P. 784; Strong v. Olsen, 74 Cal. App. 518, 241 P. 107. Pero la ordenanza estableció una norma absoluta de conducta y privó al jurado del derecho a especular sobre lo que esa entidad ideal conocida como hombre de prudencia ordinaria hubiera hecho bajo circunstancias similares."

Frecuentemente la cuestión gira sobre la manera en que se va montado en el vehículo o sobre la posición más o menos peligrosa adoptada por el pasajero, más bien que sobre el mero hecho que corría en el estribo.

En *Fidelity Union Casualty Co.* v. *Carpenter,* 125 So. 504, un tal Gordy, mientras estaba parado en el estribo derecho de un automóvil Dodge, fué golpeado por un camión que daba contramarcha hacia la calle desde la acera en que había sido estacionado, a un ángulo como de 45 grados. La corte de Louisiana dijo:

"Es perfectamente claro que si Gordy hubiese estado dentro del automóvil, en vez de estar en el estribo, él no hubiera sido herido. El juez de distrito fué de opinión que constituye negligencia *per se* el correr en el estribo de un automóvil, y que por tanto, admitiendo que el conductor del camión había sido negligente, resolvió que Gordy no podía recobrar debido a su propia negligencia contribuyente. Al tiempo de ocurrir el accidente no había ordenanza en la ciudad de West Monroe, ni estatuto alguno del estado, que prohibiera el correr en el estribo de un automóvil, y ha sido repetidamente resuelto en otras jurisdicciones que el ir en ese sitio no constituye negligencia *per se*. Blashfield's Cyclopedia of Automobile Law, vol. 4, p. 134; Hamilton v. Harrison, 126 Kan. 188, 268 P. 119; Anderson v. Detroit Motor Bus Co., 239 Mich. 390, 214 N. W. 172; Rose v. Cartier, 45 R. I. 150, 120 A. 581; Garvin v. Cohen, 136 A. 330, 5 N. J. Misc. R. 296; Koss v. A. Geo. Shulz Co., 195 Wis. 243, 218 N. W. 175.

"En todos los casos arriba citados se resolvió que el viajar en el estribo de un automóvil no constituye negligencia *per se,* pero que una persona puede ser negligente al colocarse en una posición peligrosa en el estribo, y que la cuestión de si el que viaja de esa manera es negligente, depende de las circunstancias, y que la cuestión de negligencia debe ser resuelta por el jurado o por la corte inferior.

"Puede concebirse que una persona asuma una posición en el estribo de un automóvil en marcha que le haga razonablemente inmune al tránsito; sin embargo, si permite que su cuerpo se extienda más allá de los bordes del estribo y de los guardalodos, se expone al riesgo adicional de ser estropeado por otros automóviles. En otras palabras, la posición puede o no ser peligrosa, y la cuestión de negligencia en cada caso debe ser determinada de acuerdo con las circunstancias. Los hechos en este caso están ante nos, y creemos que Gordy corría de manera negligente. Estaba parado en el estribo agarrado a la capota con su mano izquierda, mientras que su cuerpo, a nuestro juicio, se movía demasiado hacia la parte exterior del automóvil. Dice que la parte superior de su cuerpo estaba dentro del coche, pero otros testigos declararon lo contrario. La lectura de todo el testimonio nos convence que si Gordy no hubiera estado tan afuera, él no hubiera sido estropeado. Los abogados dicen que él no fué negligente al estar en la posición que ocupaba, pero fué negligente al no estar alerta y al no tomar las debidas precauciones para su propia seguridad."

Otro ejemplo puede encontrarse en *Nugent* v. *Fair Haven*

*& W. St. Ry. Co.,* 46 Atl. 875. En dicho caso la corte de Connecticut resolvió, según aparece del sumario, lo siguiente:

"Cuando los rieles de un tranvía son colocados sobre una calzada en tal forma que se hace necesario situar los postes cerca de la vía, y el demandante, con conocimiento de tal situación, va montado en el estribo del lado de los postes, se niega a subir a la plataforma a instancias del conductor, se echa hacia un lado para permitir que éste pase, y su cabeza choca contra uno de los postes, el demandante tiene derecho a daños y perjuicios nominales solamente al dictarse sentencia en rebeldía, toda vez que fué culpable de negligencia contribuyente."

En *Worden* v. *Anthony,* 126 Atl. 919, otro caso de Conn., no había controversia alguna en cuanto a los hechos:

"El interfecto era un muchacho de 16 años 4 meses de edad, y estudiaba en la escuela superior. Era bastante robusto y alto para su edad, y bien proporcionado. El 9 de julio, 1923, mientras se hallaba de vacaciones, y como a las 2 de la tarde, penetró en una carbonera en Cos Cob, cerca de su casa. Un camión, perteneciente a Edward Tammany, con unas tres toneladas de carbón mineral en sacos, estaba listo para entregarlo en Stamford. Era un camión Federal, de 2 toneladas y media. Tenía una caja grande y pesada, de seis pies dos pulgadas de ancho que sobresalía de las ruedas, y los sacos de carbón estaban colocados tan altos que sobresalían de la caja. La parte delantera del camión consistía de una casilla dentro de la cual estaba situado el asiento del conductor. El muchacho decidió dar un paseo y se montó al extremo derecho del asiento del conductor, y otro muchacho, de 16 años, iba sentado al medio, yendo el conductor Tammany, en el extremo izquierdo del asiento. El camión inició su viaje hacia Stamford, y al saltir de Cos Cob empezó a subir una cuesta en la carretera de Boston, conocida como la colina de Allen. En este sitio había mucho tránsito. La carretera era de asfalto, y tenía como 16 pies de ancho. Cuando el camión estaba cerca de la cúspide de la colina, el motor empezó a fallar, cual si no recibiera bastante gasolina. El interfecto, a iniciativa propia, se bajó del camión, y dando la vuelta por la parte delantera del vehículo, que se movía lentamente, se subió y se tendió sobre el guardalodo izquierdo. y con su mano derecha trató de manipular la válvula de aire. No era necesario hacer tal cosa. Estaba en parte tendido sobre el lado izquierdo de su cuerpo y sobre su estómago, con la espalda al tránsito. El guardalodo tenía diez pulgadas y media de

ancho, y daba una vuelta como de cuatro pies tres pulgadas sobre
la rueda delantera hasta llegar al sitio en que se unía al estribo, el
que tenía dos pies de largo y en su parte trasera llevaba una caja
de diez pulgadas de largo y diez pulgadas y media de alto, siendo
las ocho pulgadas restantes usadas a manera de escalón para subir
a la casilla.    Debido a la altura y al tamaño del muchacho, parte de
su cuerpo sobresalía del borde del estribo.

"Tan pronto como el conductor vió al muchacho sobre el estribo,
le dijo que se montara de nuevo dentro de la casilla, o que de lo
contrario podría ser estropeado por algún carro que pasara.    El muchacho se negó a ello, y continuó en esta posición hasta 'que el camión
recorrió 880 pies, a una velocidad como de' diez millas por hora.    El
camión Ford vacío del demandado, guiado por un empleado de éste,
se apareció detras del camión de carbón, cuando éste llegó a la cima
de la colina de Allen.    Cuando el camión de carbón empezó a descender por la colina. el Ford surgió de la parte trasera y empezó a
pasarle por la izquierda.    Cuando el conductor del Ford estaba bien
al lado del camión de carbón para pasarle, vió un carro que venía
hacia él en la dirección contraria.    Juzgó que tenía suficiente tiempo
y espacio para pasarle al truck de carbón, y ponerse fuera de la trayectoria del carro que venía, y así lo hizo.    Después que se apartó de
la parte trasera de la caja del camión, su atención se dirigía principalmente al carro que venía, en cuya trayectoria se encontraba, y luego
el conductor del Ford prestó testimonio al efecto de que él no vió
al muchacho sobre el estribo, y no sabía que estuviese allí.    Le pasó
al camión y continuó su viaje sin saber que hubiera ocurrido algo.
No hubo contacto recio entre los camiones, pero parece que el Ford
al pasar tuvo un leve contacto con el camión que portaba carbón, e
hizo que la parte del cuerpo del muchacho que sobresalía le arrastrara sobre el guardalodo delantero en que yacía, y 'que cayera bajo
el camión que portaba carbón, y que su rueda derecha trasera le
pasara por encima y lo matara."

En *Hinch* v. *Elliot*, 175 Atl. 684, un tercer caso de Conn.,
se dice:

"... La demandante, con su esposo, su cuñado y otra mujer,
salieron de la casa del cuñado en el automóvil de este último en dirección a una playa que estaba como a diez millas de la quinta,
con el propósito de bañarse.    El automóvil era marca Chevrolet, de
dos asientos, y tenía además un asiento auxiliar en la parte trasera.
Las mujeres ocupaban el asiento auxiliar.    A su regreso venían en
la parte delantera del automóvil, una en cada lado.    La prueba pre

sentada por la demandante fué al efecto de que estaban sentadas entre los guardalodos y el bonete del carro, y que la demandante tenía sus pies sobre el parachoques, y estaban agarradas a la varilla que enlazaba los faroles. La corte inferior dice en su opinión declarando con lugar la moción para anular el veredicto, que la corte y el jurado examinaron el automóvil y que éste estaba construído de tal manera que las mujeres no podían haber estado sentadas entre los guardalodos y el bonete, sino que tenían que haber estado sentadas sobre los primeros. El propósito de ellas al colocarse en esa posición era el de secarse el cabello. Parte del camino de la playa a la casa seguía la carretera de Boston, que es una vía de mucho tránsito. El automóvil discurría por esta carretera, hasta poco antes del accidente, a una velocidad de 35 ó 40 millas por hora. Al aproximarse a un camino transversal, el carro del demandado, que venía en dirección contraria, viró sin dar ninguna señal de que iba a entrar en la carretera, interrumpiendo así el paso del coche de la demandante. El conductor de este último carro usó los frenos, y viró hacia la izquierda, pero siempre la rueda derecha delantera de su carro chocó con la rueda izquierda trasera del carro del demandado. Ninguno de los carros se volcó, y ninguno de los dos hombres que venían sentados en el asiento delantero del coche de dos asientos fué sacado del automóvil ni sufrieron daño grave alguno. Las mujeres fueron lanzadas fuera del carro y ambas resultaron lesionadas."

Véanse también *Ivancich* v. *Davies,* supra; *Guilfoile* v. *Smith,* 116 Atl. 237, y *Shaw* v. *Moore,* 162 Atl. 373.

En el caso de autos la prueba presentada por los demandantes tendió a demostrar: que frente a la puerta izquierda delantera del Chevrolet había un mecanismo para gomas de repuesto, pero no había goma alguna; que Jorge estaba sentado en cuclillas en el estribo izquierdo en el espacio que debía haber estado ocupado por el neumático de repuesto, con un pie puesto en el portagomas o en las agarraderas, con su espalda sobre el guardalodo izquierdo delantero, y agarrando con una mano el farol auxiliar o su sostén, adherido al lado del automóvil, cerca del parabrisas; que ninguna parte de su cuerpo se extendía fuera de la línea de trayectoria del carro en el cual viajaba; que la caja y los guardalodos del Cadillac, modelo 1926, estaban construídos a un nivel más alto que la

caja y los guardalodos del Chevrolet; y que Jorge, cuando fué golpeado por el guardalodo izquierdo delantero del Cadillac, o inmediatamente después del golpe, fué atrapado entre el guardalodo y la parte delantera del Chevrolet.

No hubo nada que indicase que Jorge era grande o pequeño, robusto o raquítico. No hubo prueba alguna que indicase el ancho del guardalodo ni el ancho del portagomas vacío, ni el ancho del guardalodo delantero del Chevrolet. En otras palabras, no había medidas que corroborasen o que contradijesen la prueba del demandante al efecto de que ninguna parte del cuerpo de Jorge se extendía más allá de la línea de trayectoria del Chevrolet.

Podría admitirse que si Jorge hubiese estado viajando, aun en la forma descrita por los testigos de los demandantes, sobre el estribo de un carro en una calle de una ciudad de mucho tránsito, hubiera sido culpable de negligencia. En el caso de autos nada había que indicase que el peligro ocasionado por lası condiciones del tránsito fuese inminente u obvio.

Los apelantes insisten en que la carretera era estrecha en el sitio donde ocurrió el accidente y que Jorge sabía esto porque había visitado Isla Verde frecuentemente. La única evidencia presentada en relación con el conocimiento que Jorge tenía del ancho de la carretera, fué la declaración de un testigo al efecto de que Jorge había viajado por la misma carretera diariamente durante la semana que precedió al accidente. El mismo testigo admitió que la carretera era bastante estrecha, pero añadió que había suficiente espacio para que los carros se pasaran unos a otros sin dificultad. Otro testigo dijo que la carretera era lo suficientemente ancha para que dos carros pudieran pasarse, aun a bastante velocidad, y dejando bastante espacio. Un tercer testigo declaró que él viajaba diariamente por esa carretera en un carro de caballos, y que había espacio para dos automóviles. La testigo principal del demandado declaró en la repregunta, que la carretera era bastante ancha; que ella vivía en Río

Piedras y conocía la parte de la carretera que queda frente a la Universidad; que la carretera allí era más ancha; que era ancha; que la carretera de Isla Verde no era tan ancha como la que pasaba frente a la Universidad, y que el ancho de la carretera de Isla Verde era un poco menos que el de la carretera frente a la Universidad. Otro testimonio de la demandada tendió a demostrar que la carretera era, en el sitio donde ocurrió el accidente, lo suficientemente ancha para acomodar tres automóviles el uno junto al otro.

Lo más que puede decirse de tal testimonio (fuera de otros riesgos que por el presente pueden ser desechados), es que el mismo podría dar lugar a discusión en la sala de deliberaciones de un jurado con respecto a si un hombre razonablemente prudente se hubiese aventurado a viajar por tal carretera en el estribo de un automóvil, en una posición que le permitiese el mantener todo su cuerpo dentro de los límites del espacio cubierto por el automóvil en su trayectoria. Asumiendo, como asumen los apelantes, en el segundo señalamiento, que la corte de distrito decidió que Jorge no era culpable de negligencia contribuyente, no hay base suficiente, ya sea en el testimonio relativo al ancho de la carretera o en cualquiera otra parte de la evidencia presentada en el juicio, que justifique a esta corte en revocar ese dictamen de la corte inferior. Esta conclusión puede ser sostenida además por otras consideraciones.

No nos detendremos a especular sobre la analogía que pueda hallarse en la sección 473 del "Restatement". Empero, en el comentario (c) hallamos lo siguiente: "Cuando un demandante tiene derecho a esperar que las condiciones le son favorables, puede tomarse mayor riesgo que cuando meramente tiene un privilegio no protegido por un derecho."

La sección 468 del "Restatement", y los comentarios (a) y (b) (omitiendo los ejemplos) leen así:

"Sección 468.—Daño no resultante de peligro a consecuencia del cual la conducta del demandante puede ser calificada de negligente.

"El hecho de que el demandante haya dejado de ejercer el cuidado necesario para su propia seguridad no impide que obtenga indemnización a menos que el daño por él sufrido sea el resultado de un riesgo por él asumido a consecuencia del cual su conducta pueda calificarse de negligente.

"(a) La regla expresada en este artículo es aplicable a la responsabilidad del demandante por su propio descuido, la misma que es aplicada en el comentario (e), artículo 281, para determinar la responsabilidad de un demandado negligente por el daño causado a un demandante. Por tanto, una persona cuya conducta es negligente solamente porque probablemente le somete a un riesgo específico, no está impedida, como demandante, de recobrar por una lesión que resulte de una causa distinta al riesgo por ella asumido.

.        .        .        .        .        .        .

"(b) La regla expresada en este artículo es aplicable al caso en que la conducta del demandante es negligente solamente por tender a exponerlo a una clase o clases específicas de riesgos. Hay muchos actos y omisiones que son negligentes debido a su naturaleza generalmente peligrosa y no debido a su tendencia a crear un riesgo o riesgos específicos. La regla sentada en este artículo no es aplicable al caso en que la negligencia del demandante es de esta última índole."

En *Powers* v. *City of Boston*, 154 Mass. 60, 61, se dijo:

"Al momento de ocurrir el accidente el demandante iba de pie en el estribo de un tranvía abierto, cobrando el pasaje, y cuando su cuerpo, que él permitió que sobresaliera del borde del estribo, se puso en contacto con la barrera que había sido colocada a dos pulgadas del indicado borde, recibió un golpe que le lanzó al suelo y sufrió las lesiones en cuestión."

La corte, por voz del Juez Holmes, en la página 63, dijo lo siguiente:

". . . No hay duda alguna de que si un hombre voluntariamente corre hacia un peligro del cual está completamente advertido, no puede recobrar en casos ordinarios, y es más bien una cuestión de palabras que de sustancia, si puede o no calificársele de negligente, o si puede decirse que asumió el riesgo. . . . Pero un hombre no asume el riesgo de todo peligro que pueda surgir de ciertas causas solamente porque, en general, él tiene conocimiento de la existencia de las mismas."

En *Vendrell* v. *Sanders*, 80 A.L.R. 550, la Corte Suprema de New Hampshire, resolvió lo siguiente, tal como consta del sumario:

"1. Una persona que es invitada por el conductor de un automóvil a viajar en él, no es culpable de negligencia contribuyente como cuestión de derecho por el mero hecho de estar montado en el estribo.

"2. El asumir un riesgo no es una defensa en una acción por daños sufridos por una persona lanzada del estribo de un automóvil, en el que viajaba por invitación del conductor, cuando éste viró rápidamente a una velocidad considerable."

Anticipando la posible objeción de que en el caso de autos no se trata de una acción en contra del dueño del automóvil en que Jorge viajaba, podemos observar incidentalmente que la corte de Massachusetts, en el caso de Powers, dijo también:

"En tanto en cuanto la petición para que se dicte una orden al efecto de que el demandante fué negligente, se basaba en el hecho de que éste staba parado en el estribo, y permitió que su cuerpo sobresaliera del borde exterior del estribo, no hay duda, a nuestro juicio, que la cuestión debe ser sometida al jurado, en una acción contra la compañía ferroviaria. Meesel v. Lynn & Boston Railroad, 8 Allen 234; Fleck v. Union Railway, 134 Mass. 480; City Railway v. Lee, 21 Vroom 435; Geitz v. Milwaukee City Railway, 32 Minn. 404; Dickinson v. Port Huron & Northwestern Railway, 53 Mich. 43; Germantown Passenger Railway v. Walling, 97 Penn. St. 55; West Philadelphia Passenger Railway v. Gallagher, 108 Penn. St. 524, 528. Es cierto que en tal acción el demandante tiene a su favor el hecho de que el demandado fué el causante de la conducta que ahora alega fué negligente, pero el razonamiento de los casos no depende completamente sobre este hecho, y las cortes han llegado a la misma conclusión en acciones contra terceras personas en casos de colisiones. Spofford v. Harlow, 6 Allen 176; Connolly v. Knickerbocker Ice Co., 114 N. Y. 104."

En *Wright* v. *Foreman*, 86 Cal. App. 595, la Corte de California resolvió, tal como consta del sumario, que:

"Bajo circunstancias ordinarias un peatón que cruza una esquina no está obligado a anticipar que el conductor de un automóvil, en una calle de una ciudad de mucho tránsito, cruzará el centro de

la calle y continuará sobre el lado izquierdo de la misma, sino que en el ejercicio de un cuidado ordinario tiene derecho a asumir que el conductor, bajo tales circunstancias, obedecerá las leyes usuales del tránsito."

En *Rignell* v. *Font*, 266 Pac. 588, la Corte de Distrito de Apelaciones de California, dijo:

". . . En el ejercicio de ordinaria prudencia, un peatón puede depender de la probabilidad de que los automóviles obedecerán las leyes usuales de tránsito, y que viajarán solamente por el lado derecho de la calle."

En *Wilkerson* v. *Sanderson*, 26 S. W. (2d.) 1, la corte se expresó así:

"El apelado, Ocie Sanderson, con un número de trabajadores ocupados en la construcción de carreteras, en la noche de octubre 8, 1928, regresaba a su hogar en Mayfield, en un camión que tenía una casilla y una caja o plataforma plana con ciertos pilares o postes a los lados. El piso del automóvil se extendía sobre las ruedas en la parte trasera, y el apelado y otras personas, estaban sentados allí con sus pies colgando. Un automóvil Chevrolet que iba en la dirección opuesta, guiado por el apelante, C. K. Wilkerson, mientras pasaba al camión en o cerca del puente de Possum Creek, le dió al pie del apelado, fracturándole la pierna izquierda en dos partes, torciéndole el tobillo y lesionándole la rodilla derecha. Otros dos hombres que estaban sentados entre el apelado y la parte trasera fueron lanzados fuera del camión. Sanderson estaba sentado a horcajadas sobre uno de los pilares, lo que sin duda impidió que fuese lanzado fuera del camión, y lo que quizás también explica lo serio de sus lesiones. Los hombres que estaban sentados más cerca de la puerta del camión no recibieron golpe alguno, ni parte alguna del camión demostró evidencias de choque. Había algunas abolladuras en el guardalodo del carro del apelante. La agarradera de la puerta fué sacada violentamente y se hicieron algunas rayaduras al lado de ésta."

La Corte de Apelaciones de Kentucky dijo:

". . . No hay ley alguna que prohiba que se corra de esta manera. Por el mero hecho de que parte del cuerpo del demandante sobresalga del borde del camión, el demandado no tenía derecho a pisarlo, y no estaba relevado de su deber de ejercer cuidado razonable

para evitar lesionarlo. Sanderson estaba justificado en asumir que el apelante, ni nadie, violarían la ley de automóviles al no estar alerta y al dejar de mantenerse en su derecha sin moverse hacia el centro de la carretera hasta poderlo hacer con toda seguridad.''

En *Stout* v. *Lewis, et al.,* 123 So. 346, la Corte Suprema de Louisiana, en las páginas 347 y 348, dijo lo siguiente:

''Es indudable que el demandante fué culpable de negligencia al ir en el estribo del automóvil del demandado en violación de la ordenanza de la ciudad, y podría decirse que si no hubiese sido por su negligencia al viajar en el estribo, el choque con el automóvil de Louis, a pesar de que el automóvil de Han iba conducido negligentemente, no le hubiera causado los daños de que se queja el demandante. En otras palabras, si hubiera estado dentro del automóvil, el choque no fué lo suficientemente violento para haberlo lesionado.''

''Un estudio somero del asunto nos llevaría a este resultado. En verdad nuestra primera impresión con respecto a la conducta del demandante era fatal a sus probabilidades de éxito, ya que estábamos grandemente influídos por la posición peligrosa que asumió voluntariamente en violación de la ordenanza de tránsito, pero después de reflexionar más detenidamente, nos hemos convencido de que estábamos equivocados.

''La negligencia del demandante en este caso, en tanto en cuanto a recobrar se refería, su negligencia contribuyente envolvía la asunción del riesgo y del peligro consiguiente. Asumió el riesgo al colocarse en una posición peligrosa. Si acaso se puede decir que los daños sufridos por él eran las consecuencias naturales del riesgo asumido, entonces no puede recobrar.

''No es suficiente decir que no hubiera recibido lesiones, si no hubiera estado en el estribo, porque podía haber permanecido allí sin recibir daño alguno hasta que hubiese llegado al sitio donde se dirigía, a no ser porque el carro en cuyo estribo viajaba hubiese sido guiado negligentemente, riesgo que él no asumió.''

Véase también *Cosse* v. *Ballay,* 149 So. 285. Del sumario de *Moreno* v. *Los Angeles Transfer Co.,* 186 P. 800, tomamos los siguientes párrafos:

''El demandante, que estaba sentado en una máquina aplanadora con sus pies colgando a uno de sus lados, no fué culpable de negligencia contribuyente al dejar de mirar hacia atrás ya que él podía asumir que un camión que había alcanzado o trataba de pasar a la

aplanadora, permanecería bastante a la izquierda al pasarle, de conformidad con la Ley de Automóviles.''

''Negligencia contribuyente no puede estar basada en que se deje de asumir que otra persona violará la ley.''

En *Piatek* v. *Swindell,* 151 Atl. 262, los hechos pertinentes son resumidos en el primer párrafo del sumario, de la manera siguiente:

''El demandante estaba sentado en el piso de la casilla del camión con su pierna derecha colgando fuera de la casilla y su pie derecho descansando en el estribo derecho. No había espacio para él en el asiento de la casilla. Cuando el camión llegó a un cruce, el demandante vió al carro del demandado a cierta distancia, y a juzgar por esto y asumiendo que la velocidad a que venía el demandado no era excesiva, creyó que el camión pasaría la intersección antes de que el demandado llegase a ella.''

La Corte Suprema de New Hampshire, dijo en parte:

''Si se dijera que el demandante fué negligente al sentarse en la posición en que estaba, se debería a los peligros que probablemente se arrostrarían. Y si al estar en esa posición tomó las precauciones correspondientes y observó la vigilancia debida contra tales peligros, no debe decirse que fué negligente por no haber estado alerta contra peligros que no tenía que anticipar. No hay negligencia en arrostrar peligros desconocidos y no anticipados. . . Si asumió una posición negligente, no lo era en relación con el demandado, de quien no se anticipaba peligro alguno.

''No constituye negligencia el asumir que otra persona cumplirá con su deber cuando no hay justificación para asumir lo contrario, y la posición del demandante era análoga a la de un peatón, quien al cruzar una calle, no está obligado a anticipar peligros que no son razonablemente previstos. McCarthy v. Souther, 83 N. H. 29, 32; 137 A. 445. . . .

''Se arguye que el demandante fué negligente porque él arrostró innecesariamente un peligro conocido. El argumento es defectuoso con respecto a los hechos y a la ley. Según ya se ha visto, el demandante desconocía la existencia del peligro, o por lo menos, podría decirse que era uno por el cual no puede declarársele negligente al dejar de anticiparlo. Y el incurrir en un peligro conocido no es el equivalente legal de negligencia. Prichard v. Boscawen, 78 N. H. 131; 133; 97 A. 563, y casos citados; Hussey v. Railroad, 82 N. H.

236, 241, 242; 133 A. 9; Owen v. Hospital, 82 N. H. 497, 499, 136 A. 133.''

Véase también *Dania Lumber & Supply Co.* v. *Senter,* 152 So. 2.

Los casos anteriores son meras ilustraciones de la regla general tal como es establecida en 42 C.J. 1136, artículo 909, en donde se dice en parte, lo siguiente:

''Bajo la regla de que los derechos de todas las personas que usan las vías públicas son recíprocos, cualquier persona que se encuentra en la carretera tiene derecho a asumir, en ausencia de conocimiento o notificación en contrario, que otras personas que también usan las vías públicas, ejercerán cuidado ordinario para evitar lesionarle y puede asumir que obedecerán y no violarán los estatutos u ordenanzas y los reglamentos de tránsito, y no será culpable de negligencia contribuyente al actuar bajo esta asunción.''

Esto, por supuesto, es solamente un aspecto de la regla más general tal como ha sido expresada en 45 C.J. 954, artículo 512, a saber:

''En ausencia de conocimiento contrario, ya sea expreso o implícito, una persona puede asumir que él no está expuesto, ni amenazado por un peligro que podría sobrevenirle al dejar otras personas de cumplir con sus deberes. Así pues, puede asumirse que todas las precauciones exigidas a otros para impedir lesionarle han sido o serán tomadas, ora el deber de tomar tales precauciones surja del impuesto por el derecho común de ejercer la ordinaria prudencia para evitar lesionar a otros, o de la costumbre, relaciones entre las partes, o de los contratos, dominio y tenencia de los bienes, y por razón de un estatuto u ordenanza. En otras palabras, él no está obligado a anticipar los actos u omisiones negligentes de otras personas. Se ha resuelto que esto es lo cierto aunque sitúe su persona o propiedad en una posición arriesgada o peligrosa.''

Por las mismas razones el presente caso cae a nuestro juicio dentro de la regla de la sección 468, supra, del ''Restatement'', más bien que dentro de la excepción. Sin embargo, la investigación que hemos hecho de este aspecto del caso ha sido sin la ayuda de los letrados debido a una necesidad algo superficial. Por lo menos, un caso bastante re-

ciente (*Hinch* v. *Elliot,* supra) a pesar de que se puede distinguir en sus hechos, indica la naturaleza debatible de esta cuestión. Sin duda pueden hallarse otros casos. En el ínterin, sin perjuicio de que hagamos una discusión más amplia en casos futuros, nuestra conclusión es que en el caso de autos el riesgo de ser estropeado por un automóvil que iba de paso, no era uno de aquellos peligros ni de aquellos daños inminentes y obvios que Jorge, como hombre razonablemente prudente, estaba obligado a anticipar y considerar antes de asumir su posición en el estribo.

Si la carretera hubiese estado asfaltada, y si el Chevrolet en una tarde lluviosa hubiera patinado en el asfalto mojado, hacia el centro de la carretera cuando el Cadillac se echó hacia su izquierda; si Jorge hubiera sido movido de su sitio como resultado de cierta aspereza en la superficie de la carretera y hubiera caído frente al Cadillac, o si hubiese sido lanzado del estribo al desviarse el Chevrolet, primero hacia la izquierda y luego hacia la derecha, al pasar a otro vehículo, inmediatamente antes de encontrarse con el Cadillac, y si este último hubiera pasado sobre su cuerpo, entonces podría decirse que estos resultados incidentales al manejo corriente del carro en que Jorge viajaba pudieron haber sido previstos, y hubieran sido previstos, por cualquier persona razonablemente prudente. Jorge no podía haber previsto a menos que anticipase un manejo descuidado del carro, que mientras él estaba en el estribo, en la posición ya indicada, él sería estropeado por un automóvil que pasara. Con respecto a ese riesgo, y eliminando la posibilidad de negligencia de parte del conductor del carro en que Jorge estaba viajando, su posición era bastante segura hasta que se hizo peligrosa por la desviación repentina del Cadillac hacia el centro de la carretera. Las disposiciones estatutarias que reglamentan el manejo de automóviles fueron promulgadas para el beneficio y protección del público que viaja. No vemos razón alguna por la cual Jorge, como parte de ese público, deba

considerarse que se colocó fuera de las disposiciones estatuta-
rias y de la protección ofrecida por la ley, meramente porque
al momento del accidente iba montado en el estribo de un
automóvil en la forma y en las circunstancias reveladas por
la prueba del presente caso.

El juez de distrito en el curso de su relación del caso y
opinión dijo que el Chevrolet se detuvo, inmediatamente des-
pués del accidente, como a dos metros del sitio donde yacía
Jorge, mientras que el Cadillac se paró a 20 metros de allí,
lo que demostraba que este último viajaba a gran velocidad.
Se señala esto como error.

Se arguye que en *Efret* v. *Quiñones,* 40 D.P.R. 192, citado
por el juez de distrito, los hechos eran distintos; que en el
presente caso el cuerpo de Jorge chocó con el guardalodo
trasero izquierdo del Cadillac, lo que demuestra que la con-
ductora de este último no vió el accidente ni sabía qué había
ocurrido; que el testimonio de la hermana de la conductora
fué a ese mismo efecto; que si el niño fué *atrapillado* contra
la puerta del Chevrolet, la inferencia lógica es que el Che-
vrolet condujo el cuerpo del niño unos cuantos metros más
allá del lugar del accidente, sobre todo cuando éste iba muy
agarrado del Chevrolet; que el carro de cocos donde iba el tes-
tigo de los demandantes, Jesús García, se encontraba en el
momento del accidente a 10 metros del sitio del suceso, y Gar-
cía, que iba sentado en la parte trasera del mismo, no se tiró
del carro, lo que demuestra que el Cadillac se detuvo mucho
antes de 10 metros del sitio del accidente, y que si el cuerpo
del niño estaba a 20 metros de aquél en que paró el Cadillac y
a 2 metros detrás del Chevrolet, entonces este último necesa-
riamente tenía que haber corrido más de 10 metros con el
niño todavía en el estribo después del choque.

El hecho de que el caso de *Efret* v. *Quiñones,* supra, pueda
distinguirse del presente no es un factor determinante. El

hecho de que el cuerpo de Jorge chocara con el guardalodo trasero izquierdo después de haber chocado con el guardalodo delantero izquierdo de dicho automóvil y fuese *atrapillado* contra la puerta del Chevrolet no prueba que la conductora del Cadillac no se diera cuenta de lo ocurrido. El testimonio de su hermana tiende claramente a una conclusión contraria.

El hecho de que el cuerpo de Jorge chocara con el guardalodo trasero izquierdo del Cadillac y dejara una abolladura en el mismo, como a 14 pulgadas sobre el estribo, después de haber sido *atrapillado* contra la puerta del Chevrolet por el guardalodo delantero del Cadillac, no tiende a demostrar que el cuerpo del niño fuera conducido más allá por el Chevrolet en su estribo, sino que tiende fuertemente a probar lo contrario. Nada hay que revele que él continuara agarrado al sostén de la lámpara auxiliar después que su cuerpo había sido golpeado y atrapado por el guardalodo delantero izquirdo del Cadillac. La forma en que fué estropeado y *atrapillado* hace que tal teoría sea enteramente insostenible. Las premisas en que los apelantes tratan de basar su conclusión final son igualmente falsas. Cuando el Cadillac se detuvo, la carreta de cocos no se hallaba ni a 10 metros ni a 20 metros del lugar dèl accidente.

■ De la relación del caso y opinión emitida por el juez de distrito tomamos el siguiente párrafo:

"Además ha quedado probado que inmediatamente después del accidente el niño fué recogido por el chauffeur del Chevrolet y llevado al hospital donde murió, pero que antes se dirigió dicho chauffeur donde la señora Umpierre y la inculpó, imputándole la responsabilidad del hecho y pidiéndole que recogiera a la víctima, lo que no hizo dicha señora. Esta tampoco compareció al juicio, ni se dió explicación alguna de su omisión en prestar declaración, siendo ella la persona que guiaba el automóvil Cadillac que ocasionó el daño y parte interesada en la investigación de la verdad. *Fajardo et al.* v. *Tió*, 17 D.P.R. 244. Por otra parte, la contestación aparece jurada por el demandado Salvador Quiñones, diciendo constarle los hechos

en ella alegados de propio conocimiento, cuando según la evidencia él no se hallaba en el sitio del accidente al ocurrir el mismo.''

El comentario que se hace sobre el haber dejado la conductora del Cadillac, que era también uno de los demandados, de ocupar la silla de los testigos se señala también como error. Las circunstancias indicadas en el contexto, en adición a todos los demás hechos que salieron a relucir durante el juicio, hacen, a nuestro juicio, que el presente caso caiga dentro del principio enunciado en el de *Fajardo* v. *Tió*, 17 D.P.R. 244, citado por el juez de distrito, más bien que en el de *Banco Territorial y Agrícola* v. *Vergne*, 43 D.P.R. 949, en que se fundan los apelantes. Sea ello como fuere, de existir el error difícilmente podría considerarse como uno que dé lugar a la revocación.

■ El quinto señalamiento es que la corte de distrito cometió error al admitir prueba de los sufrimientos morales y físicos de los demandantes. La única autoridad citada a este respecto es el caso de *American Railroad* v. *Santiago*, 9 Fed. (2d) 753, ya discutido por esta Corte en *Orta* v. *Porto Rico Railway, Light & Power Co.*, 36 D.P.R. 743, y *Carbou* v. *Mir*, 809. Los apelantes no atacan la conclusión a que se llegó en *Orta* v. *Porto Rico Railway, Light & Power Co.* ni en *Carbou* v. *Mir,* supra, aunque el juez de distrito citó el caso de Orta en su relación del caso y opinión. Es innecesario que repitamos ahora lo que se dijo en dichos dos casos.

En vista de la naturaleza debatible de la cuestión de negligencia contribuyente nos inclinamos a convenir con los apelantes en que no debió habérseles condenado al pago de las costas.

*En lo que al pronunciamiento de costas se refiere, la sentencia debe ser revocada, y confirmada en todos sus demás extremos.*