MANUEL FONT, demandante y apelado, *v.* VIKING CONSTRUCTION CORPORATION, demandada y apelante.

Núm. 8177.—*Sometido:* Abril 23, 1941. *Resuelto:* Mayo 23, 1941.

*Juan B. Soto* y *Enrique Igaravídez,* abogados de la apelante; *Rafael Rivera Zayas,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Manuel Font alegó en una demanda en reclamación de daños y perjuicios, que siendo gerente de la Puerto Rico Cement Corporation y estando el 4 de mayo de 1938 con la anuencia de la demandada inspeccionando la planta de cemento que estaba construyendo la demandada Viking Construction Corporation en Cataño, P. R., se cayó dentro de un pozo registro de dicha planta que estaba bajo la posesión de la demandada y que, por negligencia de ésta se encontraba abierto completamente y sin protección alguna, sufriendo con tal motivo una dislocación del hueso del brazo derecho, te-

niendo que recluirse en cama en una clínica y ausentarse de sus negocios durante seis días y se vió obligado a gastar $76 en atención médica y hospitalaria y sufrió daños corporales y mentales por la suma de $10,000.

La demandada, en su contestación, negó que estuviera construyendo la planta de cemento; que en la fecha alegada no ocupaba ni tenía posesión de dicha planta, pero admitió que estaba trabajando en la planta instalando un sistema de tubería para conducción de fuerza, aceites, gas, aire comprimido, electricidad, etc., y como parte de dicho sistema, instalando en pozos de registro de dicha planta, válvulas de escape y registros de presión; negó que diera su anuencia o consintiese que persona alguna y específicamente el demandante transitara por, inspeccionara o interviniera cerca de la instalación o pozos de registro que existen en la planta; negó que el demandante fuera gerente general de la Puerto Rico Cement Corporation o estuviera facultado o autorizado para inspeccionar dichos pozos de registro o los trabajos que estaba realizando la demandada; admitió que era necesario para su trabajo remover la cubierta de los pozos de registro pero negó que en la fecha del accidente estuviese ningún pozo de registro abierto, y alegó que cuando así lo estaban, por trabajar en ellos la demandada, siempre estaban debidamente atendidos o por un empleado de la demandada o por una red de barrotes de hierro; negó que el demandante sufriera accidente alguno el 4 de mayo de 1938 por haber estado abierto algún pozo, ni se cayera dentro de uno de los pozos de registro o que esto se debiera a negligencia alguna de la demandada; negó que por su negligencia el demandante sufriera dislocación de hueso alguno de su brazo derecho ni que sufriera daños y perjuicios de clase alguna. Admitió, sin embargo, que el demandante sufrió un accidente en dicha fecha, aunque la demandada desconoce las causas, extensión y consecuencias del mismo.

Como materia nueva de defensa especial la demandada alegó que si al caerse el demandante en el pozo de registro

medió alguna culpa o negligencia por parte de la demandada o de cualquiera de sus empleados, también medió la propia culpa, descuido y negligencia contribuyente del demandante y que ésta fué la causa próxima e inmediata del accidente; que la demandada no autorizó al demandante para que transitara por la planta sin estar acompañado de un empleado de la demandada y que el demandante lo hizo, acompañado de otras personas, de una manera descuidada, sin mirar al piso y mirando hacia el techo a pesar de que conocía la existencia de los pozos y que en ellos se estaba trabajando, y que se cayó debido a que no observó diligencia y cuidado y distraía su vista hacia otros extremos y pormenores del ·techo del edificio, todo lo cual constituyó la causa próxima del accidente y de los daños consiguientes.

Celebrado el juicio correspondiente la corte inferior dictó sentencia declarando con lugar la demanda y condenó a la demandada a pagar al demandante $328 por concepto de gastos de hospitalización, servicios médicos y placas de radiografía; $2,500 como indemnización por los daños consistentes en sufrimientos físicos y morales e incapacidad parcial permanente en el uso de su brazo derecho y $500 por concepto de honorarios de abogado más las costas. No conforme la demandada apeló para ante este tribunal y hace un señalamiento de diez y seis errores para sostener su recurso, los que pasamos a considerar en el mismo orden en que los discute en su alegato.

Por el primero y tercero se sostiene que la corte inferior erró al declarar con lugar la demanda cuando en la misma no se alegó que existiera obligación alguna de la demandada para con el demandante y tampoco de cubrir los fosos que existían en la planta de cemento. El resumen que hemos hecho anteriormente de las alegaciones de la demanda demuestra que estos errores carecen de mérito alguno. El demandante alegó que la demandada ocupaba la planta de cemento y tenía la posesión y control de un pozo de registro que, por negligencia de la demandada, se encontraba abierto

y la apertura carecía de protección alguna y que el demandante, gerente de dicha planta, se encontraba con la anuencia de la demandada inspeccionando la planta cuando se cayó en el pozo registro. De estas alegaciones surgen los elementos esenciales que deben alegarse para que pueda prosperar una acción por negligencia, según los expone la corte inferior en su opinión, tomándolos del caso de *Miranda* v. *P. R. Ry. Light & Power Co.*, 31 D.P.R. 778, al decir lo siguiente:

"En toda acción derivada de culpa o negligencia es imperativo alegar y probar los siguientes extremos: (*a*) la existencia de un deber por parte del demandado de proteger al demandante contra daños, (*b*) el incumplimiento de ese deber por parte del demandado, y (*c*) el daño resultante."

Si el demandante, como gerente de la planta de cemento, tenía derecho a penetrar en ella y la demandada estaba en posesión y control del pozo registro y negligentemente lo tenía descubierto, claramente se alegó que la demandada dejó de cumplir con el deber de observar el debido cuidado para con el demandante.

■ Para la discusión y resolución de los demás errores se hace necesario examinar los hechos que la corte inferior consideró probados, los que hizo constar en su opinión en la forma siguiente:

"Examinada la prueba testifical, documental, y con vista de la inspección ocular practicada, la corte encuentra probados los hechos siguientes:

"El demandante, Manuel Font, aparenta ser un hombre como de 52 años de edad; era, en la fecha del accidente, Gerente de la Puerto Rico Cement Corporation y Coronel de la Reserva del Ejército de los Estados Unidos. La Puerto Rico Reconstruction Administration estaba recibiendo en una planta de cemento que había hecho construir para la Puerto Rico Cement Corporation, todas las instalaciones eléctricas, bombas y tuberías que había contratado con dicha Administración la demandada, Viking Construction Corporation. Font había estado destacado en la planta durante su construcción, desde noviembre de 1937. El día 4 de mayo de 1939 (sic), entre las 4:30 y 5:00 de la tarde, el demandante visitó la planta en

compañía del Lic. Benignò Fernández García, entonces *Attorney General* de Puerto Rico. No había gran claridad dentro del local, y mientras ambos andaban por el pasillo central, en dirección Norte a Sur, el demandante iba a la derecha del señor Fernández García. Ambos dieron una vuelta por la planta, y al regresar, Font cayó dentro de un foso de varios pies de profundidad, golpeándose el hombro derecho con el borde del foso, al caer. En ese momento no había nadie en las proximidades del lugar del suceso, sólo Font y Fernández García. De la inspección ocular practicada se comprobó que el foso tiene 58 pulgadas de largo, 41 pulgadas de ancho y 40 pulgadas de profundidad. A cada lado del foso hay un pasillo, el de la derecha entrando más ancho que el de la izquierda; y a ambos lados del foso y de los pasillos que lo bordean, están instaladas las maquinarias en una línea sucesiva y continua. El foso tenía una tapa de rejilla, removida y colocada al lado, que cubre toda su superficie con fines de protección. Esta tapa es de hierro fundido, estilo enrejillado, y su peso no es menor de 200 libras.

"El día del accidente, y a la hora en que sucedió, ya se habían terminado las faenas diarias, y dentro del local sólo quedaban el Ingeniero Don David Ramírez con un ayudante, revisando con una lámpara eléctrica de mano las placas de varios motores, y dos empleados de la demandada, Armengol Pérez y Juan Cruz Molina, haciendo ciertos trabajos en la instalación eléctrica. Ninguna de estas personas estaba cerca del sitio del accidente y todas declararon que no vieron cómo sucedió, y sólo se enteraron después de haber pasado y de oír los quejidos de Font. Ni Pérez ni Cruz Molina son precisos en sus declaraciones con respecto a la hora: el primero dice que no sabe, pero que fué después de medio día como entre dos y media y tres. Por otro lado, Font, Fernández García y Ramírez precisan la hora del accidente y fijan ésta después de las cuatro y media. A esta hora es que se termina el trabajo del día en la planta, y esto explica la ausencia de trabajadores, con excepción de los dos que se han mencionado, empleados de la demandada, y del ingeniero Sr. Ramírez, que hacía una labor especial de inspección de entrega.

"El demandado Font en muchas ocasiones anteriores había transitado por ese mismo sitio, sabía que el foso existía pero conocía también la existencia de un enrejillado que se ponía sobre el mismo cuando no se estaba trabajando, y la obligación en que estaba la demandada, de acuerdo con su contrato (Artículo 9, página 10, párrafos 17, 18, 19, 20 y 21) de rodear todas sus actividades de

la debida protección para el público y los trabajadores, y proveer de luces, barreras y otros medios de protección, todas las maquinarias, equipo y otros sitios de riesgo. En ocasión anterior había visto el foso abierto pero provisto de una barandilla con luces rojas.

"El inspector Sr. Ramírez declaró que cuando se entregó el foso a la demandada para realizar el trabajo que había contratado, la parrilla estaba puesta, y que el día anterior, había pasado por el sitio, vió la parrilla sin poner, y le llamó la atención al señor Lyons, que estaba frente del trabajo en representación de la demandada.

"Como consecuencia de la caída, Font experimentó un intenso dolor que posteriormente se comprobó fué debido a una fractura en la tuberosidad mayor del húmero derecho. Se sometió a un prolongado tratamiento con el doctor José Guzmán Soto, gastando en hospitalización, medicinas y placas radiográficas, $78, abonando a su médico $50 por servicios, y quedándole a deber, según el demandante, $200, y según el Dr. Guzmán Soto, alrededor de $250. Para conformar las alegaciones sobre daños específicos, a la prueba, la corte admitió una enmienda a la demanda, en el sentido de adicionar a la alegación sexta la oración 'y la suma de $250 por atención médica prestada por el Doctor Guzmán Soto.' La prueba pericial del demandante, corroborada en su casi totalidad por los propios peritos de la demandada, Doctores González Martínez y Soto Rivera, no deja lugar a dudas acerca de la fractura sufrida por Font, como consecuencia de trauma y dislocación del brazo derecho, de la limitación funcional de ese miembro en su abducción y rotación y de la existencia, de una artritis causada por la dislocación y fractura que justifica el dolor intenso sentido por el paciente y las molestias que sigue sintiendo en el funcionamiento del brazo. Esta incapacidad en una persona de la edad del demandante es de carácter permanente y la limitación del brazo derecho puede calcularse entre un veinte y un veinticinco por ciento de su función normal."

Con la excepción a que hacemos referencia al discutir el décimosegundo error, podemos decir que estas conclusiones de hecho están sostenidas por la evidencia presentada por las partes según la transcripción que obra en autos.

Por el segundo error se alega que no hubo prueba de que la demandada estuviera en posesión exclusiva o tuviera bajo su cuidado la planta de cemento. La alegación esencial

de la demanda es al efecto de que la demandada tenía bajo su posesión y control el pozo registro en la planta de cemento y la demandada en su contestación admitió que para la fecha del accidente estaba trabajando en dicha planta instalando un sistema de tubería y como parte del mismo y en los pozos de registro, válvulas de escape, y que mientras se trabajaba en dichos pozos era necesario mantenerlos descubiertos removiendo la cubierta movediza de barrotes de hierro que se reponía al terminar la labor. Estas admisiones de la demandada complementan las alegaciones de la demanda y, unidas a la prueba justifican plenamente la conclusión a que llegó la corte inferior de que la demandada estaba en posesión y control del pozo de registro en que estaba realizando el trabajo antes mencionado.

Por los señalamientos cuarto y quinto se alega que se cometió error al declarar que el demandante no fué culpable de negligencia contribuyente y que no hubo evidencia justificativa de tal extremo, y que no fueron las actuaciones del demandante la causa próxima del accidente. Al discutir estos errores la apelante sostiene que la corte inferior actuó movida por pasión y prejuicio al apreciar la prueba. Hemos leído cuidadosamente la transcripción de evidencia y somos de opinión que es correcta la conclusión a que llegó dicho tribunal al expresarse en su opinión en la forma siguiente:

"La demandada, aunque lo alega afirmativamente, no probó que el demandante asumiera el riesgo de sus actos al visitar la planta cuando lo estimaba necesario. La natural interpretación de las cosas y de las relaciones en los asuntos corrientes nos dice que el demandante con motivo de su cargo oficial, tenía el derecho a visitar la planta, y por consiguiente, correspondía a la demandada probar que no tenía obligación alguna de protegerle contra accidentes en estas visitas. Por el contrario, la prueba revela, que el demandante sabía que la demandada estaba obligada a mantener los fosos cubiertos, muy especialmente, cuando no se trabajaba en ellos, y tenía el derecho de asumir, que terminadas sus labores, el día del accidente, que el foso estaría debidamente cubierto o protegido, y que esta situación no sería alterada o variada por la demandada. No

hubo a juicio de la corte negligencia contribuyente por parte del demandado. Véase la excelente discusión de este concepto jurídico en el caso de *Jorge* v. *Umpierre,* 49 D.P.R. 78. La causa próxima, a juicio de la corte, fué la negligencia y descuido de la demandada en desatender su obligación de mantener el foso tapado, agravada esta desatención más aun, por razón ·de haber terminado las labores del día en el mismo, sin que aparezca excusa alguna que la relevara de esta elemental precaución.''

Del ''Restatement of the Law of Torts'' volumen segundo, sobre ''Negligence'', tal como fué adoptado y promulgado por el ''American Law Institute'', tomamos las siguientes definiciones y comentarios de la sección 466 que trata sobre negligencia contributoria.

''Sec. 466.—La negligencia contribuyente del demandante puede ser (*a*) una intencional e irrazonable exposición de sí mismo a un peligro creado por la negligencia del demandado, cuyo peligro el demandante conocía o tenía motivo para conocerlo, o (*b*) conducta que, en otros respectos que los mencionados en la cláusula (*a*), está por debajo del 'standard' que el hombre razonable debe observar para protegerse de un daño.''

Si aceptamos la teoría de la demandada tendríamos que aplicar al demandante una de estas dos reglas. En cuanto a la cláusula (*a*) no es aplicable porque no hay nada en la evidencia que tienda a probar que el demandante conocía o tenía motivo para conocer el peligro que existía, es decir, que la demandada por sus empleados había dejado el pozo registro descubierto al terminar los trabajos del día. Por el contrario, se probó que la demandada por costumbre o por obligación ponía la tapa enrejillada o barandillas con luces cuando el foso permanecía abierto. Comentando la cláusula (*a*) se dice en la misma obra:

''Para que la conducta del demandante pueda constituir negligencia contribuyente bajo la cláusula (*a*), el demandante debe conocer la condición física creada por la negligencia del demandado y debe tener conocimiento de tales hechos que, como hombre razonable, se dé cuenta del peligro envuelto. Más aun, el demandante debe intencionalmente exponerse a ese peligro. No es suficiente que

el dejar de ejercer razonable atención a sus alrededores le priven de observar el peligro. . . Por último su exposición al peligro conocido debe ser irrazonable. Para que sea irrazonable es necesario que un hombre razonable en su posición no se expondría al mismo.''

Basta la enunciación de los distintos ejemplos expuestos para concluir que la actuación del demandante no cae dentro del alcance de la cláusula (a), supra. Veamos los comentarios a la cláusula (b):

"La negligencia de que trata la cláusula (b) consiste usualmente en que el demandante deja de poner *razonable atención a sus alrededores* para descubrir el peligro creado por la negligencia del demandado, o de ejercitar razonable cuidado y diligencia para evitar el peligro *cuando lo percibe* o de prepararse como hombre razonable . . . para evitar un peligro futuro.''

Los hechos probados en el caso de autos tampoco hacen que pueda aplicarse al demandante la cláusula (b). Como hemos dicho antes, se demostró que la demandada debía tener los pozos registros tapados cuando terminaba el trabajo pues dejarlos abiertos constituía un peligro para cualquier persona que transitara por la planta. El demandante sabía esto y, como dice la corte inferior, tenía derecho a asumir que a la hora en que ocurrió el accidente el foso estaría cubierto o protegido. Como gerente de la planta de cemento tenía derecho a entrar a ella y no puede decirse que por el hecho de que se la mostraba al Lic. Fernández García, dejó de poner la *razonable atención* a sus alrededores de que nos habla el comentario anterior. Ni él ni su acompañante pudieron percibir el hueco que existía debido a la semioscuridad que había dentro de la planta.

El caso de *Muriel* v. *Marchán,* 21 D.P.R. 325, citado insistentemente por la demandada a través de su alegato no es aplicable al de autos. Los hechos de uno y otro varían fundamentalmente. Basta citar el siguiente párrafo de la opinión en dicho caso:

"La corte declaró además que de las alegaciones de la demanda solamente se probaron las que se referían a la caída y a las lesiones

recibidas; *que no se demostró la negligencia del demandado y que el accidente sólo pudo ocurrir debido a la inexcusable negligencia del demandante;* que un edificio sin divisiones interiores que en sus dos plantas tiene las puertas y ventanas que se dejaron enumeradas *y que según la prueba del mismo demandante estaban abiertas indudablemente estaba bastante iluminado para que cualquiera persona nada más que de mediana prudencia pudiera ver el agujero y haber evitado caerse por él;* que el agujero estaba en un sitio que podía ser visto por el demandante antes de llegar a él, puesto que, si bien tiene al lado la barandilla de la escalera, ésta es de balaustres bastante separados y que no impedían verlo; *que este agujero con relación al piso y a la claridad de una y otra planta, es a manera de un transparente iluminado, que sólo ha podido inadvertirse por una gran negligencia."* (Itálicas nuestras.)

El *ratio decidendi* fué que el demandante dejó de probar la negligencia del demandado y por el contrario se probó la negligencia contribuyente del demandante. Los hechos ocurrieron en pleno día y cuando Muriel pudo haber visto el agujero por donde se cayó. Resalta, por tanto, la diferencia de los hechos del caso de *Muriel* con los del que resolvemos.

■■ Por el sexto señalamiento se alega que la corte inferior erró al sostener que ésta es una acción *ex-contractu* y que aun siendo *ex-delicto* existía la obligación por parte de la demandada para con el demandante, y se cita el siguiente párrafo, incompleto, de la opinión, para sostenerlo:

". . . Aparte de esto, la demandada tenía esta obligación de acuerdo con su contrato y aun cuando el derecho de acción del demandante no nazca del contrato, y no ser por tanto esta acción una 'ex contractu', las disposiciones impuestas a la demandada en su contrato con la Puerto Rico Reconstruction Administration, obligándola a tomar medidas para la protección contra daños a terceros, y definiendo cuáles debían de ser estas medidas, pueden ser propiamente admitidas en evidencia no con el fin de basar en ellas una reclamación, sino para probar el deber de la demandada de proteger al demandante contra un daño. Aparte de eso, el deber surge claro de la naturaleza del lugar donde ocurrió el accidente y de las demás circunstancias que revela la prueba."

La parte del párrafo que no cita la demandada dice así:

"El demandante, como gerente de la Puerto Rico Cement Corporation tenía un perfecto derecho a visitar la planta. Lo venía haciendo desde noviembre de 1937, y el propio testigo de la demandada Aronson admite estas visitas en su declaración. La naturaleza de su cargo conlleva el derecho de inspeccionar aquello que está o va a estar bajo su administración. Correspondía a la demandada demostrar que el curso natural de las cosas tenía una excepción en este caso. Por ser el lugar donde se trabajaba un sitio reducido, oscuro, y estar localizado el foso en medio de un pasillo, y siendo como era y es el hueco, ancho, largo y profundo, y a flor del piso, incumbía a la demandada como cuestión de la más elemental diligencia y cuidado, mantener este foso tapado con su rejilla de hierro, especialmente cuando no se trabajaba en él, y más aun, cuando ya habían terminado las labores del día. Esta obligación de la demandada, no sólo era para con el demandante sino también para con toda persona, empleado o no, que tuviere necesidad o derecho a transitar por aquel sitio."

No es que la corte inferior haya basado su decisión en el contrato que, innecesariamente fué admitido como evidencia, sino que expresamente hace constar que la acción es una *ex-delicto* y no *ex-contractu*. El error al admitir el contrato, de haberse cometido, no fué perjudicial, como se sostiene en el mismo caso de *Lewis* v. *La Nier, et al.,* 270 P. 656, citado por la apelante, donde se dijo lo siguiente:

"El demandante ofreció en evidencia, y la corte, al objetarse, no admitió, las disposiciones de un contrato entre el Estado y los demandados que dicen así: (se copian).

"Si el propósito era demostrar que la demandante puede demandar a los demandados por negligencia al causar la muerte de su marido, el rehusar la admisión no fué perjudicial, porque el caso fué visto bajo la teoría que la demandante tenía derecho a demandar. Independientemente del contrato ella tenía ese derecho.

"Si la contención es que los demandados son responsables en esta acción por no haber hecho lo que requería el contrato entre el Estado y los demandados, independientemente de si eso constituía o no negligencia, la contención no puede sostenerse. Ésta es una acción basada en negligencia; está alegada como tal; fué a juicio

y sometida al jurado como tal. La medida del deber de los deman-
dados en este caso tiene que determinarse por la ley que gobierna
los casos de negligencia, no por las disposiciones del contrato.''

Esto resuelve además del sexto, el décimocuarto señala-
miento que se refiere a la admisión del contrato en evidencia.

■ En los señalamientos séptimo y décimosegundo se
alega que la corte erró al admitir prueba sobre daños espe-
cíficos en una acción general de daños y al conceder ·$328
por gastos de hospitalización, servicios médicos, etc., cuando
en la demanda sólo se reclaman $76.

En su opinión la corte inferior al referirse a estos daños
dice lo siguiente:

''. . . Para conformar las alegaciones sobre daños específicos a
la prueba, la corte admitió una enmienda· a la demanda, en el sen-
tido de· adicionar a la alegación sexta la oración 'y la suma de $250
por atención médica prestada por el Doctor Guzmán Soto.' ''

Lo que realmente resolvió la corte, según aparece a la
página 23 de la transcripción de la evidencia, fué lo siguiente:

''Juez—La corte, en uso de su discreción, va a admitir la enmienda
a los efectos de considerar, *dentro de la alegación general de daños,*
la determinación de la cuantía *pero no para determinar esta canti-
dad reclamada de $250 como daños específicos ya que los únicos
daños específicos que se reclaman en la demanda son los $76 paga-
dos a la Clínica Díaz García.''* (Itálicas nuestras.)

Los errores fueron cometidos y serán tomados en consi-
deración al dictarse la sentencia ya que, de por sí no con-
llevan la revocación.

■ Los señalamientos octavo y décimotercero alegan que
la corte inferior erró al sostener que se había probado que
la Puerto Rico Reconstruction Administration estaba reci-
biendo la obra realizada por la demandada y al sostener que
el ingeniero Ramírez fuera un inspector en la obra relacio-
nada con el contrato de la demandada. Carecen de impor-
tancia, en la resolución definitiva que del caso hizo la corte
sentenciadora, estos pronunciamientos de la opinión, ya que

el hecho de la negligencia de la demandada no dependía de que se probara que la Puerto Rico Reconstruction Administration estaba recibiendo la obra ni de que el Sr. Ramírez fuera o no inspector de la demandada.

■ Sostiene la demandada apelante por el décimoquinto señalamiento que la corte erró al sostener que el demandante era un "invitee" de la demandada. No encontramos nada en la opinión que en apoyo de su sentencia dictó la corte inferior que demuestre que el caso fuera resuelto aplicando la doctrina de que el demandante fuera un "invitee" de la demandada. Por el contrario, en la opinión, como hemos visto anteriormente, se hace constar que el demandante como gerente de la Puerto Rico Cement Corporation visitaba la planta por su propio derecho y que la demandada conocía dichas visitas y nunca se opuso a ellas. El hecho de que la planta, en cuanto a las instalaciones que en ella estaba realizando la demandada, no se había entregado a la Puerto Rico Reconstruction Administration, en nada afectaba el nombramiento que como gerente había recibido el demandante y que le daba derecho a entrar a ella. De la deposición prestada por el testigo de la demandada Samuel Aronson, aparece contestando las preguntas 17, 18 y 22 en esta forma:

"17. Do you know the person who it is alleged fell in this pit, and if so, do you know whether that person was acquainted or not with the work being done at the plant by your Company?

"A. Yes. Manuel Font. He had already been appointed head of all the manufacturing work which the plant was going to do. He had a full knowledge of the plans and specifications of the building.

"18. Did he visit the plant frequently?

"A. *Yes he did.*

"  .      .       .        .        .         .      .

"22. Was it customary for Mr. Font to walk through the plant showing visitors the different machinery installed therein?

"A. He did show several visitors through." (Itálicas nuestras.)

De manera que la demandada sabía y admitió que el demandante era el gerente de la planta y que la visitaba

frecuentemente solo o acompañado de otras personas sin que haya nada en la evidencia que demuestre que la demandada hiciera oposición alguna a dichas visitas. No hubo el error.

El décimosexto se refiere a que la corte admitió prueba de hechos ocurridos con posterioridad a la radicación de la demanda y que no estaban alegados. La evidencia objetada por la demandada según la relaciona en su alegato al discutir este error se refiere a la declaración del Dr. José de Guzmán Soto y a la admisión de unas placas radiográficas que éste le tomó al demandante el día 31 de mayo de 1938, es decir, trece días después de radicada la demanda en este caso el 17 de mayo del mismo año. El fundamento principal de la objeción de la demandada fué que en la demanda se alegó que el demandante sufrió la dislocación del hueso del brazo derecho y la declaración del perito y las placas demostraban que tenía una fractura en dicho brazo. El error al admitir esta prueba constituía una incongruencia esencial, como sostiene la apelante, a no ser por el hecho de que, de su propia prueba y por la declaración del testigo Dr. Isaac González Martínez, no se hubiera demostrado, como se demostró, que la placa radiográfica que se le hizo al demandante inmediatamente después del accidente y que por tener un defecto el Dr. González Martínez informó que no ofrecía evidencia de fractura, al compararla dicho perito con las otras traídas por el Dr. Guzmán Soto, declaró que sí demostraba la fractura. El Dr. González Martínez explicó lo ocurrido en esta forma:

"T.—Bueno, estas radiografías demuestran una fractura. Ahora, en conexión con esto permítame decirle que yo ví una radiografía que me llevó el señor Font . . . El señor Font varias semanas después me llevó una radiografía en la cual aparecía una fractura, esta fractura. *Entonces yo le pedí a Font que me dejase esa radiografía para yo cotejarla con la radiografía que había tomado mi ayudante. La cotejé y entonces pude ver en aquella radiografía lo que la inspección primera no me había dejado ver, porque era confusa, pero la misma línea de fractura que hay aquí aparece en la radiografía que tomó mi ayudante.* (Itálicas nuestras.)''

Los artículos 136, 137 y 138 del Código de Enjuiciamiento Civil disponen lo siguiente:

"Artículo 136.—Ninguna incongruencia entre las alegaciones y las pruebas en un juicio se tendrá por esencial, a menos que por su índole y efectos dé lugar a que la otra parte incurra en su perjuicio, en falsas apreciaciones al mantener su demanda o su contestación. Siempre que una de las partes resultare así equivocada, la corte podrá disponer que se enmiende la alegación en los términos que estimare justos."

"Artículo 137.—Cuando la incongruencia no fuere esencial según lo previsto en el precedente artículo, la corte podrá resolver que el hecho se admita de acuerdo con la prueba, o disponer una enmienda inmediata sin costas."

"Artículo 138.—Sin embargo, cuando las alegaciones de la demanda, o contestación a que se refiera la prueba, queden sin probar, no en algún particular o particulares solamente, sino en su alcance y significación general, no deberá considerarse como un caso de incongruencia, con arreglo a los dos últimos artículos, sino como deficiencia de la prueba."

Interpretándolos y citando anterior jurisprudencia, este tribunal por medio del Juez Asociado Sr. De Jesús en el caso de *Carrasquillo* v. *Ripoll y Maldonado, Int.*, 56 D.P.R. 395, 401, se expresó así:

"El fin de la ley es la justicia. Las reglas de procedimiento, como las de evidencia, no son otra cosa que el medio para llegar a ese fin. De ahí que la infracción a una o más de estas reglas no produzca efecto legal alguno a menos que dicha infracción haya causado perjuicio a la parte que exige su cumplimiento. Inspirados en este principio y en la moderna tendencia a prescindir de la forma cuando lejos de facilitar obstaculiza la justicia, los tres artículos antes transcritos requieren que para que una incongruencia entre las alegaciones y la prueba sea fatal, la incongruencia debe ser *esencial*, es decir, que 'por su índole y efectos dé lugar a que la otra parte incurra, en su perjuicio, en falsas apreciaciones al mantener su demanda o su contestación.'

"Interpretando el artículo 136 supra, se dijo por este Tribunal en el caso de *Guánica Centrale* v. *Colberg et al.*, 27 D.P.R. 684, 686:

" 'La verdadera intención de ese artículo es que a no ser que exista una diferencia muy esencial entre las alegaciones y la prueba, *deberá probarse en el juicio la esencialidad de una incongruencia.'*

"En el caso de *Díaz et al.* v. *Rosado et al.,* 30 D.P.R. 515, 530, se pronuncia este tribunal en igual sentido cuando dice:

" 'Y', se ha dicho, 'que de acuerdo con tales estatutos no es bastante con que una parte alegue meramente que ha sido inducida a error, *sino que debe probarse a satisfacción de la corte.* Generalmente debe presentarse un affidavit que muestre en qué particular ha sido sorprendida o inducida a error la parte.' 31 Cyc. 703 y casos citados." (Itálicas nuestras).

En el caso de autos no sólo dejó la demandada apelante de probar en el juicio a satisfacción de la corte sentenciadora la esencialidad de la incongruencia y que había sido inducida a error, sino que, por el contrario, su propia prueba demostró con la declaración del Dr. González Martínez que tenía conocimiento de que lo que había sufrido el demandante en su brazo derecho había sido una fractura y no una dislocación. De acuerdo con la prueba presentada, no sólo por el demandante sino también por la demandada, lo que el demandante en realidad debió haber hecho en este caso fué enmendar su demanda para ajustarla a la prueba. Que este tribunal puede, en casos apropiados, considerar la demanda como enmendada, ha sido resuelto en los casos de *El Pueblo* v. *Sucn. Valdés,* 31 D.PR. 223; *Montalvo* v. *Teatro Caborrojeño,* 35 D.P.R. 785; *Dragoni* v. *U. S. Fire Insurance Co.,* 36 D.P.R. 469; *D. Agüero & Co.* v. *Navarrete,* 37 D.P.R. 812, 815; *Ismert Hinke Milling Co.* v. *Muñoz,* 37 D.P.R. 819; *Central Pasto Viejo* v. *A. Pérez & Hno.,* 44 D.P.R. 904, 908; *Canals* v. *Vidal,* 53 D.P.R. 210, 217. En el caso de *El Pueblo* v. *Sucn. Valdés,* supra, se citó con aprobación la siguiente nota que aparece en el de *Ellinghouse* v. *Ajax Line Stock Co.,* LRA 1916–D 841 a la página 843:

"Las cortes de apelación han sido liberales en permitir enmiendas a las alegaciones o considerar la enmienda como que se hace en apoyo de la sentencia, cuando la enmienda es de tal naturaleza que debió haberse permitido por la corte inferior al solicitarse y la jus-

ticia substancial se promovería con tal procedimiento. *En estas circunstancias se ha resuelto generalmente que la sentencia no será revocada debido a los defectos u omisiones en las alegaciones que se subsanan por la prueba* o las alegaciones *de la parte contraria,* o debido a una incongruencia entre las alegaciones y la prueba si la suficiencia de las alegaciones no fué debidamente atacada en la corte inferior, o la prueba introducida sin objeción, o aparece claramente que el defecto o incongruencia no afectó a los derechos substanciales de las partes pero . . . la enmienda se considerará que ha sido hecha.'' (Itálicas nuestras.)

Somos de opinión que el defecto u omisión que tenía la demanda en este caso quedó subsanado por la prueba de la demandada y que es de aplicación, por tanto, el artículo 142 del Código de Enjuiciamiento Civil que dispone que:

''Artículo 142.—En cualquier estado de un pleito la corte no tomará en cuenta algún error o defecto en las alegaciones o procedimientos que no afecten a lo esencial de los derechos de las partes, y no se revocará o invalidará ningún fallo por razón de dicho error o defecto.''

▇▇▇▇ Los señalamientos noveno y undécimo alegan que la corte cometió error al apreciar la prueba al sostener hipotéticamente y sin base alguna en la prueba que el demandante ''tuviera necesariamente que ser afectado en mayor grado que otra persona por el hecho de la profesión que ejercía y del cargo que desempañaba'' y al fijar los daños en $2,500, por sufrimientos físicos y morales e incapacidad parcial permanente en el uso del brazo derecho del demandante.

Al fijar la cuantía de los daños la corte inferior se expresó así:

''Para fijar la cuantía de los daños sufridos por el demandante se han tomado en consideración por la corte las molestias, dolores y sufrimientos del demandante, la incapacidad parcial permanente como consecuencia de la artritis producida por la dislocación y fractura, así como la edad y posición del demandante, en que como ingeniero y Coronel de la Reserva del Ejército de los Estados Unidos, tiene necesariamente que ser afectado en mayor grado que otra persona que no tuviera esta profesión ni desempeñara tal cargo.''

El Dr. Guzmán Soto al describir el estado del demandante como consecuencia del accidente declaró, a repreguntas de la demandada, en parte, lo siguiente:

"A.—Y dígame una cosa, Doctor. Esa dislocación y esa fractura ¿qué cantidad de incapacidad dijo usted que producía?

"T.—Bueno, considerando el síntoma dolor persistente y sus alternativas de agudeza de esos síntomas dolorosos, aparte de la limitación en la abducción, y la rotación hacia atrás, de un 20 a un 25 por ciento de incapacidad en las funciones del brazo derecho.

"A.—Dígame una cosa, Doctor. Formado ya en esa fractura el callo y unido ¿es posible que el paciente recobre su normalidad?

"T.—Yo esperaba que sí al principio, pero la persistencia de los síntomas, a pesar del tratamiento y del transcurso del tiempo transcurrido, y como dije antes, considerando la edad del lesionado, la estimo una condición permanente.

"A.—En cuanto a esa parcial incapacidad que usted . . .

"T.—Sí señor. Yo no creo que progrese más. Pudiera mejorar, pero eso es eventual. Tampoco podría decir si después de muchos años mejorará."

El demandante que ya había declarado que había ejercido su profesión de ingeniero veintiséis años, al preguntársele qué sufrimientos mentales tuvo como consecuencia de las lesiones, se expresó así:

"T.—Puede imaginarse el sufrimiento y la preocupación de haber recibido una lesión como esa en mi brazo derecho. . . una persona que como yo no tiene otros medios de vida que su trabajo, que hubiera podido quedar imposibilitado en mi brazo derecho, total o parcialmente. Yo necesito mi brazo derecho porque yo dibujo, yo uso un tránsito, yo subo andamios, subo escaleras, en el Ejército tiro al blanco, y no puedo tirar al blanco.

"A.—¿Usted no puede tirar al blanco ahora?

"T.—Yo en el Ejército tenía el grado de 'Expert' en pistola y el otro día, en la finca del Senador Iriarte, no hice ni 'Marksmen' ".

Y más adelante dijo:

"A.—¿Usted dice que es Coronel del Ejército?

"T.—De la Reserva del Ejército Americano.

"A.—¿Eso significa que usted está llamado . . . puede ser llamado a servicio activo en cualquier momento?

"T.—A mí me llaman los veranos.

"A.—¿Y en un caso de emergencia nacional?

"T.—También.

"A.—¿Iría usted a servir con ese mismo rango?

"T.—Bueno, quizás ascendería a General.

"A.—¿Cuáles son los impedimentos que usted actualmente tiene en el uso de ese brazo?

"T.—Bueno, no tengo la misma libertad de movimiento que tengo con el brazo izquierdo, que lo puedo mover en todas direcciones, levantarlo, llevarlo hasta la espalda . . .

"A.—¿No puede usted?

"T.—Digo, que no tengo la misma libertad, y aun los mismos movimientos que hago van acompañados de cierta molestia . . . no puedo sostener una pistola en mis manos con firmeza, no puedo andar . . . este movimiento no puedo hacerlo, y no puedo defenderme. Yo siempre me he defendido con mis brazos y el hecho de que no me pueda defender ha creado una psicología de temor y esas cosas . . ."

En el contrainterrogatorio de la demandada, en cuanto a este aspecto del caso, el demandante contestó lo siguiente:

"A.—Y dígame, testigo ¿cuánto usted gana actualmente?

"T.—7,000 dólares.

"A.—¿Usted no ha tenido pérdida ninguna en su sueldo a virtud de esa lesión?

"T.—Ninguna.

"A.—¿Usted desempeña las funciones de su cargo actualmente con la misma eficiencia con que las desempeñaba antes, no es eso?

"T.—Con la misma eficiencia no diría yo; con un dolor constante no creo que pueda desempeñarlo con la misma eficiencia.

"A.—Subjetivamente no. ¿Pero en cuanto a las funciones que usted desempeña y su oportunidad de ganarse el dinero usted la tiene igual que antes?

"T.—Bueno, es posible, pero . . .

"A.—Y desde luego, usted no ha perdido la oportunidad de ascenso dentro del Ejército de Estados Unidos. Usted sigue siendo . . .

"T.—Bueno, yo estaría sujeto a un examen físico."

La prueba del demandante, en cuanto a las consecuencias de la lesión que recibió, no solo no fué contradicha por la prueba de la demandada, sino que tendió a ser corroborada

por las declaraciones de sus testigos peritos, los Dres. I. González Martínez y M. Soto Rivera. El primero declaró a preguntas de la demandada:

"A.—¿Dígame una cosa, pero usted podría decirle a la corte, si lo puede decir, si manteniendo ese brazo en el estado de inmovilidad necesaria podría o no podría degenerar en una incapacidad permanente?

"T.—Bueno, es muy difícil que por la inspección de una simple radiografía, sin el examen físico, sin haber hecho las pruebas de los nervios, sin haber hecho la prueba funcional de los músculos, yo pueda decir algo de eso. Ahora, nosotros tenemos que tomar en consideración un factor importante: yo dije que por lo general esto no deja incapacidad en las personas jóvenes. *El señor Font es un viejo; de manera que puede ser que a él le deje una incapacidad, porque no consolidan las fracturas tan bien en los viejos como en los jóvenes."* (Itálicas nuestras.)

Y el Dr. Soto Rivera dijo:

"A.—¿Y de acuerdo con esa radiografía puede el Doctor determinar el carácter de la incapacidad del brazo?

"T.—Bueno, por el sitio, no es una incapacidad total; por el sitio no se podría producir una incapacidad total. En cuanto a la posibilidad de causar dolores, neuralgias, algesias, *eso podría durar por mucho tiempo, a veces años. En personas jóvenes desaparecen y en personas, como ya lo han dicho los médicos aquí, de la edad del señor Font da mucho más trabajo y algunas veces dura años. Puede ser que él sufra sus molestias permanentemente; ahora, la incapacidad nunca podría ser total.* Pudiera ser que el señor Font, debido al sitio donde se está formando el callo, tenga alguna dificultad, como dice él, al mover el brazo hacia arriba; eso es posible. Y también pudiera ser que al tirar el brazo hacia atrás pudiera tener ciertas molestias que pudiera ser que fueran permanentes debido a que, como han dicho los otros médicos, *el señor Font es un poco viejo."* (Itálicas nuestras.)

Están contestes los peritos de una y otra parte, por lo tanto, que a una persona de la edad del demandante, que declaró tenía cincuenta años, una fractura, como la que él sufrió, puede dejarle una incapacidad parcial permanente y el experimentar dolores y neuralgias por mucho tiempo, a

veces años. Que la corte sentenciadora pudo tomar en consideración la profesión y cargo del demandante en tanto en cuanto pudieran ser afectados por su incapacidad parcial, no admite discusión. Lo que argumenta la demandada en su alegato es que habiéndose alegado en la demanda que el demandante sufrió "daños corporales y mentales" en estos últimos no pueden considerarse incluídos los "sufrimientos mentales." Y dice "si acaso se hubiera dicho que la reclamación incluía sufrimientos mentales, entonces quizás, mediante la prueba correspondiente, hubiese podido justificarse la declaración de la corte inferior." Es demasiado técnica la distinción que hace la demandada. El alegar "daños mentales" o no significa nada o tiene que ser equivalente a decir "sufrimientos mentales". Lógicamente no pueden haber otros daños mentales que no sean los sufrimientos mentales, que la propia demandada admite es un elemento de reclamación. Que la evidencia de las partes demostró que el demandante tuvo dichos sufrimientos además de quedar con una incapacidad parcial permanente de un veinte a un veinticinco por ciento en las funciones de su brazo derecho, tampoco admite discusión. De acuerdo con estos hechos probados no cometió error la corte sentenciadora al fijar los daños en $2,500.

Réstanos por considerar el décimo señalamiento por el que se alega que la corte sentenciadora erró al sostener que la demandada fué temeraria al defender esta acción y como consecuencia condenarla al pago de $500 de honorarios de abogado del demandante. La corte *a quo,* al exponer los motivos que tuvo para considerar que la demandada había sido temeraria, se expresó asi en su opinión:

"Al condenar a la demandada al pago de los honorarios de abogado, la corte lo ha hecho por creer que ha habido una injustificada temeridad de parte de la demandada Viking Construction Corporation. La demandada interpuso todo género de alegaciones negativas y defensas especiales a la demanda. Negó aun la ocurrencia del accidente sufrido por el demandante, aunque en otra parte

de su contestación admitió que algo ocurrió, pero que desconocía las causas, extensión y consecuencias del suceso. La demandada parece que no tuvo gran preocupación por investigar los hechos ni determinar si de alegar desconocimiento de los hechos, bajo juramento, atribuye al demandado conducta descuidada y negligente mediante alegaciones, que no pudo sostener con evidencia, de que el demandante transitaba por el lugar del suceso, conociendo el sitio del peligro, mirando hacia el techo del edificio en una actitud de completa despreocupación. El caso de la demandada, edificado sobre la base de extensas alegaciones y defensas, quedó sin probar y demostró la sin razón de su oposición a la demanda de reparación hecha por el demandante."

La demandada al argumentar este señalamiento llama la atención hacia el hecho de que contestó la demanda dentro del término original que le concedía la ley, sin interponer mociones dilatorias de clase alguna y que no podía allanarse a una reclamación excesiva de $10,000 que la propia corte inferior se vió obligada a reducir a $2,500.

El hecho de que la reclamación original haya sido rebajada por la corte inferior, es un elemento a considerar en relación con la cuantía de los honorarios de abogado concedidos pero no implica que no existan en el caso otros elementos que tiendan a demostrar la temeridad de la demandada según los apreció la corte sentenciadora. En el caso de *Fuentes* v. *Canetty,* 39 D.P.R. 173, se resolvió que si la oposición de la demandada "se hubiera limitado a la cuantía de la indemnización reclamada, que fué reducida por la corte, entonces hubiera estado en condiciones la apelante de discutir si las costas debían serle impuestas o no." Para la fecha en que fué resuelto este caso las costas incluían honorarios de abogado y el error alegado fué el no haberse excluído los honorarios.

En el caso más reciente de *Sucn. Mangual* v. *Hastings,* 56 D.P.R. 21 se resolvió lo siguiente:

"No abusó de su discreción la corte sentenciadora al incluir en el pronunciamiento de costas la partida de $300.00 para honorarios de abogado. Habiendo dado crédito a la prueba de los demandantes,

pudo la corte inferior estimar que el demandado apelante fué temerario *al no allanarse a pagar a los demandantes una razonable compensación por los daños por él causados."* (Itálicas nuestras.)

Bajo todas las circunstancias concurrentes del caso que resolvemos, consideramos que no abusó de su facultad discrecional la corte inferior al condenar a la demandada al pago de honorarios de abogado y al fijarlos en la cantidad de $500.

*Por las razones expuestas, procede modificar la sentencia dictada en este caso en el sentido de que la partida de $328 por concepto de gastos incurridos en hospitalización, servicios médicos y placas radiográficas debe ser rebajada a $76 y así modificada, se confirma.*